**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER J. REICHERT,** | : | |
| **Plaintiff**, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ELIZABETHTOWN COLLEGE,** | : | |
| **et al.,** | : | **No. 10-2248** |
| **Defendants.** | : | |

**MEMORANDUM**

**Schiller, J.**                                                                                    **April 10, 2012**

Plaintiff Christopher Reichert brought this action against Elizabethtown College, Dr. Carroll Tyminski, Dr. Mimi Staulters, Dr. Rachel Finley-Bowman, Dean Marie Calenda, Provost Susan Traverso, and Dr. Susan Pitcher under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") for failure to provide reasonable accommodations for his disabilities and for creating a hostile environment. He also sued under 42 U.S.C. § 1985 for conspiracy to discriminate against him based on his disabilities and under Pennsylvania law for breach of contract. The Court conducted a bench trial from January 9, 2012 through January 12, 2012. For the reasons stated below, the Court finds in favor of Defendants.

## I.        FINDINGS OF FACT

### A.        Reichert's Disabilities

Reichert suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), epilepsy, and other challenges in learning, including "extremely slow language processing." (Trial Tr., 1/9/12 at 43, 117-18, 128.) His disabilities create difficulties with comprehension, organization, and time

management. (*Id.* at 46, 73, 171.) As a result of Reichert's ADHD and slow language processing, Reichert has poor listening comprehension and frequently interrupts people. (*Id.* at 44.) Reichert also has seizures related to his epilepsy, which can be brought on by a lack of sleep. (Trial Tr., 1/10/12 at 114; Trial Tr., 1/11/12 at 130.)

Reichert's ADHD life coach, Casey Dixon, testified that Reichert's greatest deficit is his slow processing speed, which places his academic fluency in the first percentile for his college year. (Trial Tr., 1/9/12 at 39.) Due to his processing disorder, Reichert has a hard time listening and processing speech. (*Id.* at 118.) As a result, he must spend more time to accomplish the same work as his peers, causing him extreme frustration. (*Id.*) Dixon explained that Reichert's frustration manifests in trembling and eye rolling and leads him to raise his voice. (*Id.* at 49.) Reichert also mutters to himself as a compensatory strategy to help him focus, and he was often not aware of his muttering at the time. (*Id.* at 109, 120.)

Reichert's disabilities adversely affected his performance in college. (*Id.* at 128.) He had difficulty comprehending lectures and focusing in class. (*Id.*) If he did not get enough sleep, he might appear disheveled. (*Id.*) He sometimes blurted out inappropriate comments in class. (*Id.* at 129.) However, Reichert testified that none of these challenges affect him when he is teaching because he is "hyper-focused" and not distracted. (*Id.* at 130.)

### B. Reichert's Accommodations and Initial Experience at Elizabethtown College

In Spring 2007, Reichert was accepted to Elizabethtown College. (*Id.* at 133.) Reichert hoped to be a teacher, so he and his mother evaluated colleges based on their education departments and disability services offices. (*Id.* at 133-35.) Reichert and his mother attended Elizabethtown College's open house, and they spoke with Dr. Tyminski, Chair of the Education Department, and Shirley

Deichert, Director of Disability Services, to learn how the college supports its students with disabilities. (*Id.* at 133-35.) After enrolling at Elizabethtown College, Reichert submitted to the college his high school psychological evaluations, which document his learning disabilities. (Trial Ex. P-1 [Psychological Assessments] at 1.) Reichert's evaluations note the support services and accommodations that he received in high school, and that when in college, Reichert would benefit from a note-taker for his classes. (*Id.* at 1, 4.)

In July 2007, Reichert's high school psychologist prepared a psychoeducational evaluation addendum to provide recommendations to Elizabethtown College. These recommendations include: (1) appropriate modifications and accommodations in all classes, including foreign language classes, or a substitute for the foreign language requirement; (2) 50 percent or greater extended time for class assignments and tests; (3) development of Reichert's self-advocacy skills with support from the disability services office and (4) the option for Reichert and his parents to pursue an updated independent evaluation at their own expense if Reichert's needs change. (*Id.* at 5.)

In August 2007, Elizabethtown College approved the following accommodations for Reichert for the Fall 2007 semester: (1) 100 percent extended time for tests; (2) a distraction-free test site; (3) a note-taker if needed; (4) books on Kurzweil, software that scans and reads aloud printed material; (5) a substitution for the foreign language core requirement; and (6) no penalty for in-class misspelling. (Trial Ex. D-3 [Accommodations Sheet, Fall 2007].) In January 2008, the college added priority course scheduling to Reichert's list of accommodations. (Trial Ex. D-4 [Accommodations Sheet, Spring 2008].) Reichert received all of these accommodations as a student at Elizabethtown College. (Trial Tr., 1/9/12 at 138-39, 195-98, 204-05.) Additionally, Reichert received extended time for written assignments, which was added to Reichert's accommodation sheet in Fall 2008, so long

as the accommodation did "not jeopardize integrity of [the] course." (Trial Ex. D-6 [Accommodations Letter Additions, Fall 2008]; Trial Tr., 1/9/12 at 198.) Director of Disability Services Deichert worked with Reichert in course selection to ease his transition to college. (Trial Tr., 1/9/12 at 137.)

During Reichert's first semester at Elizabethtown College, he was caught cheating on a final exam that he was taking in the disability services office. (*Id.* at 151.) Rather than report the incident, Reichert's professor, Dr. Toro, allowed him to retake it for partial credit. (*Id.* at 151-52.) As a result of the cheating incident, however, Reichert was required to take his exams in the education department instead of the disability services office. During an exam in the education department, the proctor left the door open, preventing Reichert from having a distraction-free testing environment. (*Id.* at 166.) The new Director of Disability Services, Kris Sagun, shared Reichert's concerns about the test-taking environment with his education department advisor, Dr. Staulters, who agreed to allow Reichert to take exams in the disability services office if he was prevented from cheating. (Trial Ex. P-21 [Staulters' Notes] at 3/13/09 entry.)

Throughout Reichert's time at Elizabethtown College, faculty and students raised concerns about whether Reichert completed his own work. For example, during a group project in March 2009, one of Reichert's teammates reported to Dr. Staulters that she was frustrated because Reichert's work "had clearly been plagiarized." (*Id.* at 3/16/09 entry; Trial Tr., 1/11/12 at 57.) The teammate said that a Google search revealed that Reichert's work had been copied from a website, but when she asked Reichert to redo the work, he responded defensively. (Staulters' Notes at 3/16/09 entry.) Additionally, in a May 2009 meeting between Dr. Staulters and Reichert, Reichert's mother, and Dixon, among others, Dr. Staulters asked Dixon and Mrs. Reichert whether either had written

Reichert's curriculum-based assessment ("CBA"). (Trial Tr., 1/9/12 at 65, 167.) Dr. Staulters said that the vocabulary was too complex and that the assignment did not match the materials from class. (Trial Tr., 1/11/12 at 55.) Dixon and Mrs. Reichert both denied the charge. (Trial Tr., 1/9/12 at 65.)

> **C.    Children's Literature Assignment and Aftermath**

During Fall 2008, Reichert took a children's literature course with Dr. Snyder, which required the students to read and write brief reviews of 100 children's books over the course of the semester. Reichert felt overwhelmed by the assignment, and on September 30, 2008, Reichert and Dr. Staulters discussed whether he should drop the course. Because the course was a requirement for his major, Reichert would have to retake the course in a later semester. (Trial Tr., 1/11/12 at 41.) The education department denied Reichert's request for an exception to that course requirement due to his disability because the department's course work is approved by the Pennsylvania Department of Education for accreditation purposes. (*Id.*)

Dr. Staulters worked with Reichert on strategies to ease the workload, and they discussed the importance of the assignment for teaching and for his subsequent course work. (Staulters' Notes at 9/30/08 entry.) Upon Reichert's request, Dr. Staulters discussed the assignment with Dr. Snyder who said that "the assignment was a priority particularly because elementary teachers would be required to read hundreds of books over the course of a few months." (*Id.* at 10/6/08 entry.) However, Dr. Snyder said that "she was very flexible about deadlines for accepting the reading responses and that she had already told [Reichert] he could have extra time if necessary." (*Id.*) During their meeting, Dr. Snyder told Dr. Staulters about her concerns about Reichert's participation in class, noting that "he tended to make statements that were offensive to her or to some of the other students in class and that . . . he did not think about the impact of what he was saying before he spoke." (*Id.*) Throughout

5

the semester, Dr. Staulters met with Reichert on numerous occasions to work on strategies to complete the assignment, though Reichert repeatedly expressed his anger over having to complete it. (Trial Tr., 1/11/12 at 71.)

On the evening of November 10, 2008, Reichert approached Dr. Snyder after class and asked her to halve the number of children's books that he was required to read and review for the class because of his disabilities. (Trial Tr., 1/9/12 at 145; Trial Ex. P-3 [Snyder-Tyminski-Rankin Emails, 11/10/08-11/11/08] at 3.) At that point, Reichert had turned in ten of sixty required responses. (Snyder-Tyminski-Rankin Emails, 11/10/08-11/11/08 at 3.) In an email, Dr. Snyder expressed to Dr. Tyminski her serious concerns about Reichert's request and his conduct in the meeting. (*Id.*) Dr. Snyder wrote, "I understand that he has some disabilities, but I am concerned that this is a big reduction compared to what's expected for everyone else." She asked, "[w]hat is reasonable for him with regard to this assignment given his disability? He cites stress and epilepsy as the reasons that he can't handle this class." (*Id.*) Dr. Snyder also noted her more serious concerns about Reichert's conduct during their discussion:

> Compounding this issue is the fact that when I suggested that other students are also feeling overwhelmed, he threatened to "get loud" with me if [I] compared him to other students. He asked me to call his mother (!). He was shaking when he talked with me.
>
> I assured him that I would seek guidance from you. I also told him that I felt that he was threatening me and that I wouldn't stand for that kind of language from him. This seemed to calm him down a bit. The whole conversation was very civil, but still inappropriate in my mind.

(*Id.*) Reichert justified the encounter by noting that Dr. Snyder had insulted him by "comparing [him] to typical, non-disabled peers or adults, and [he's] not them." (Trial Tr., 1/11/12 at 146.) Reichert said he never threatened Dr. Snyder and agreed with Dr. Snyder's description of the meeting as "very

civil." (*Id.* at 147.)

On November 11, 2008, Dr. Tyminski forwarded Dr. Snyder's email to Stephanie Rankin, Assistant Dean of Students, and Reichert's academic advisors. (Snyder-Tyminski-Rankin Emails, 11/10/08-11/11/08 at 1.) Dr. Tyminski pointed out that Reichert had previously intimidated or threatened his education professors. (*Id.*) Dr. Tyminski said that she "had complaints from three ED professors before this incident. His classroom behavior is disruptive and rude. He is creating a classroom environment that makes it difficult for his peers to learn." (*Id.*) Dr. Tyminski sought advice on how to proceed. (*Id.*) Dean Rankin said that Reichert's continuing outbursts and threatening tone "would be cause for seriously considering whether this student is an optimum candidate for teaching young people." (*Id.* at 9.) She also noted that Mrs. Reichert had called disability services to complain about the 100-book requirement. (*Id.*) Dr. Staulters responded that she had repeatedly spoken with Reichert about his conduct and tone, telling Reichert "that he needs to monitor his behavior because when he becomes defensive he comes off as aggressive and very rigid in his thinking, . . . [which] appears unprofessional." (*Id.*)

Dr. Snyder and Dr. Tyminski further discussed the encounter on November 11, 2008, and Dr. Snyder emphasized that she "never felt not in control of the situation," but that she had thought about her safety when she left the building and wondered if she would find her tires slashed. (*Id.* at 7.) She also told Dr. Tyminski about Reichert's inappropriate comments that Reichert made in class, including racist remarks and ethnic generalizations. (*Id.*)

On November 12, 2008, Tyminski called an emergency meeting of the education department to discuss the concerns raised by Reichert's behavior. (Trial Ex. P-5 [Educ. Dep't Emergency Meeting Minutes, 11/12/08]; Trial Tr., 1/10/12 at 134.) Dr. Toro brought up Reichert's cheating

incident, sleeping in class, and "inappropriate racial and sexist comments," and that his attitude was arrogant and defensive. (Educ. Dep't Emergency Meeting Minutes, 11/12/08 at 2.) Dr. Pitcher, noted Reichert's disruptive side conversations and defensive responses. (*Id.*) Another faculty member, Dr. Elizabeth Coyle, felt that, based on the comments of others, Reichert was a prime candidate for a risk assessment and suggested that a school safety expert evaluate his case. (*Id.*) Dr. Tyminski expressed her concerns for the safety of faculty who teach at night and suggested that campus security should be notified. (*Id.* at 3.) The faculty voted unanimously to remove Reichert from the education program after the Fall 2008 semester because "he does not possess the dispositions necessary to become a teacher." (*Id.*)

Following the meeting, Dr. Tyminski left a message for Dean Calenda to advise her of the situation. (Trial Ex. P-6 [Phone Message for Calenda from Tyminski, Nov. 12, 2008].) When they later met, Reichert and his mother were in a meeting in the disability services office. (Trial Tr., 1/10/12 at 144.) Dr. Tyminski asked the Reicherts to join them in Dean Calenda's office, where faculty members discussed their concerns and requested a mental health evaluation. (*Id.* at 145.) Dr. Tyminski also said that the education department was considering barring Reichert from returning to the program. (*Id.*) Reichert and his parents met with Provost Traverso the following day to object to Reichert's potential removal from the education department. (Trial Tr., 1/9/12 at 159; Trial Ex. P-10 [Traverso Email to Tyminski, 11/13/08].) Provost Traverso overturned the decision to remove Reichert and said that the department would follow its standard process and review his case after the semester concluded. (Trial Tr., 1/9/12 at 159; Traverso Email to Tyminski, 11/13/08.) Provost Traverso urged Reichert to meet with Dr. Tyminski to understand the department's concerns and to learn to show respect for his faculty members. (Trial Tr., 1/9/12 at 159; Traverso Email to Tyminski,

11/13/08.) Provost Traverso also explained the professional standards required to become an educator but that not all students have the necessary maturity level to become a teacher at the time of graduation. (Traverso Email to Tyminski, 11/13/08.) Reichert's mother attributed her son's behavioral problems to his disabilities and insisted that he would achieve his goal to become a teacher. (*Id.*)

### D.      Ongoing Concerns Raised by the Education Department

On January 5, 2009, following Reichert's request for a meeting, Dr. Tyminski and Dr. Staulters met with Reichert to discuss their professional expectations for him. They informed him that extended time would sometimes not be appropriate, such as with his upcoming field work, because he would need to prepare lesson plans for classes that he would be teaching the following day. (Trial Tr., 1/9/12 at 161-62, 212; Trial Tr., 1/10/12 at 148; Trial Tr., 1/11/12 at 75-76.)

During that semester, Reichert was enrolled in the special education block of classes taught by Dr. Staulters. The classes included a field placement at an elementary school, supervised by Barbara Gordon. Dr. Staulters worked extensively with Reichert on lesson planning, and she was regularly frustrated by his lack of preparedness for their meetings. (Staulters' Notes.) Gordon also relayed her concerns about Reichert's teaching, the materials he used in class, and his lesson plans, and when Dr. Staulters discussed these concerns with Reichert, he continually responded defensively. (*Id.* at 2/25/09, 3/3/09, 3/31/09, 4/1/09, 4/2/09, 4/3/09 entries.).

During the Spring 2009 semester, Reichert continued to have difficulties in his classes. In addition to the March 2009 incident involving Reichert's teammate's allegation of plagiarism, Dr. Staulters also noted that Reichert's presentation was based on old and incomplete information. (*Id.* at 3/16/09 entry.) Later that semester, Dr. Staulters assigned the students an ungraded, untimed, in-

class, individual writing activity. (Trial Tr., 1/11/12 at 80-81.) Reichert characterized the exercise as a "pop quiz" and complained that he was not permitted to complete the exercise in the disability services office as his accommodations required. (Trial Tr., 1/9/12 at 165-66.) After completing the exercise, students were told to wait in the hallway. Reichert claimed that the talking and laughing in the hallway was "extremely distracting, humiliating, [and] . . an embarrassment." (*Id.* at 166.) Throughout the year, Reichert turned in assignments after the agreed-upon extended deadlines. (Staulters' Notes.) Dixon intervened by meeting with Dr. Staulters and Provost Traverso and arguing that Dr. Staulters' refusal to further extend deadlines was unfair, and Dr. Staulters relented at Provost Traverso's direction. (*Id.* at 4/23/09 entry; Trial Tr., 1/11/12 at 81-82.)

In August 2009, in advance of Reichert's junior year, Provost Traverso, Dr. Tyminski, Dr. Staulters, and Dr. Sagun met with Reichert, his parents, and Dixon. (Trial Tr., 1/9/12 at 65; Trial Tr., 1/10/12 at 202-03.) At that meeting, the Reicherts were informed that Dr. Tyminski was replacing Dr. Staulters as Reichert's advisor, about which the Reicherts were concerned because they viewed Reichert and Dr. Tyminski's relationship as strained. (Trial Tr., 1/9/12 at 65-66.) They also discussed Reichert's accommodations sheet for the upcoming semester, and the faculty members informed the Reicherts that extended time was not be applicable for the methods block course work because the class required field work and not exams. (Trial Tr., 1/9/12 at 66.) Instead, Reichert would have to timely submit his lesson plans, and he could not receive extensions because he would be teaching those lessons shortly thereafter. (*Id.* at 67-68.) Provost Traverso reminded Reichert that he could take the methods block courses in the following semester and take different courses in the fall semester. (*Id.* at 68.) Dixon requested advance copies of Reichert's syllabi, which she said was necessary due to his disabilities. (*Id.* at 66-67.) The faculty said no such accommodation was included on

10

Reichert's accommodation sheet. (*Id.* at 66-67; Trial Ex. D-3-D-8 [Disability Accommodations Sheets, Fall 2007 to Fall 2009].) Dixon also requested a tutor who had previously taken the methods block courses, and Dr. Sagun responded that she could only a provide a tutor who happened to be in the disability services office at the time when Reichert was requesting a peer tutor. (Trial Tr., 1/9/12 at 68; Trial Tr., 1/11/12 at 106.) Finally, Dixon requested that faculty and administrators at Elizabethtown College provide feedback on Reichert directly to her, rather than through Reichert. (*Id.* at 69.) Again, the faculty members refused this request based on their practice of not working through outside tutors and because Reichert's accommodations list did not include communications with a third party. (Trial Tr., 1/11/12 at 108-09; Disability Accommodations Sheets, Fall 2007 to Fall 2009.)

On September 1, 2009, at the beginning of the fall semester, all students enrolled in education courses received the education department's new Teacher Dispositions/Foundational Competencies Policy and Acknowledgment Form. (Trial Tr., 1/9/12 at 175; Trial Tr., 1/10/12 at 50; Trial Ex. D-10 [Teacher Dispositions/Foundational Competencies].) The policy set out the professional standards that all candidates must achieve: (1) communication/interpersonal skills, including the ability to effectively express themselves in writing and orally, communicate responsively to different perspectives in diverse classrooms, and function effectively with students and parents and collaboratively on a professional team; (2) emotional and physical abilities, including the ability to work under time constraints and concentrate in distracting situations and have the physical stamina to perform additional duties during after-school events; (3) cognitive dispositions, including the ability to organize time and materials and prioritize tasks and adapt to changing situations; and (4) personal and professional requirements, including timely arrival for professional commitments,

11

the ability to respond to constructive review from supervisors, an attitude of integrity, responsibility and tolerance, respect for self and others, and an ability to refrain from emotional, verbal, or physical threats or intimidation. (Teacher Dispositions/Foundational Competencies.) The policy acknowledged the college's legal obligation to provide appropriate accommodations to students with documented disabilities. (*Id.*) Reichert signed the form. (*Id.*)

Reichert believed that the policy was specifically designed to address his behavior. (Trial Tr., 1/9/12 at 176.) However, despite the new format, the policy reflected the same expectations that were required of students prior to September 2009. (Trial Tr., 1/10/12 at 185.) These expectations were based on the Pennsylvania Statewide Evaluation Form for Student Professional Knowledge and Practice that the education department was required to use to evaluate all student teachers prior to recommending them for certification by the Pennsylvania Department of Education. (Trial Ex. D-70 [Pa. Statewide Evaluation Form for Student Professional Knowledge and Practice]; Trial Tr., 1/10/12 at 185.) The education department decided to formulate the teacher dispositions document after a few students, without documented disabilities, failed to exhibit the professional dispositions necessary to be certified as a teacher despite their strong academic performances. (Trial Tr., 1/10/12 at 187.) The education department modeled the Elizabethtown College teacher dispositions on documents used by the University of Maryland and the University of Texas. (*Id.* at 186-87.)

Another incident took place in September 2009. Reichert was speaking with a classmate during Dr. Pitcher's class, and another student asked Reichert to stop talking. When Reichert failed to stop, the student cursed at Reichert and asked Dr. Pitcher to repeat himself because he had not heard him. (Trial Tr., 1/10/12 at 86-87.) After class, the student apologized to Dr. Pitcher for the disruption and inappropriate language. (*Id.* at 87.) He also expressed his frustration over Reichert,

and Dr. Pitcher indicated that he could speak with Dean Calenda. (*Id.* at 86-87.) The student met with Dean Calenda on November 13, 2009 to make a formal complaint. (*Id.*; Trial Ex. D-53 [Calenda Notes, 11/13/09].) He noted multiple derogatory statements that Reichert had made about his classmates and professors, and he also reported that Reichert had told him that he had cheated on tests and not been caught. (*Id.*)

In November 2009, Reichert was absent from school for several days due to sickness. (Trial Tr., 1/9/12 at 221.) Reichert received extended deadlines from his professors, which he met. (*Id.*) During his absence, Reichert mistakenly sent a Facebook friend request to the thirteen-year-old sister of a classmate. (*Id.* at 180.) The classmate called Reichert, yelled at him, and said he was a pedophile. (*Id.*) Following their conversation, the classmate and Reichert engaged in an argument over a series of text messages. (*Id.*; Trial Tr., 1/10/12 at 97-100.) The classmate and her friend approached Dr. Staulters about the situation, and Dr. Staulters brought the students to Dr. Tyminski. (Trial Tr., 1/10/12 at 156.) The students expressed fear of retribution from Reichert, and Dr. Tyminski said that if they feel fearful, then they should go to the student life office. (*Id.*) The students showed the text messages to Kat Matic, Director of Student Rights and Responsibilities. (*Id.* at 98; Trial Ex. P-46 [Matic, Calenda, Traverso, Dixon Emails, 11/24/09-11/30/09].) Matic described the messages as using inappropriate language and obscenities in anger, but she did not deem them threatening. (Matic, Calenda, Traverso, Dixon Emails, 11/24/09-11/30/09.) The classmate refused to let the messages be copied. (Trial Tr., 1/10/12 at 103.) Dean Calenda later spoke with the classmate, but she ultimately withdrew her complaint. (*Id.* at 100, 103.) Nevertheless, on November 30, 2009, Reichert received a hearing notice regarding alleged conduct that was "disorderly, lewd, or indecent," and he was required to appear at a hearing on December 3, 2009.

13

(Trial Ex. P-47 [Hearing Notice, 11/30/09].)

    **E.**    **Disciplinary Charges, Recommended Removal, and Medical Withdrawal**

    On December 3, 2009, the faculty of the education department met with Provost Traverso to discuss Reichert. (Trial Ex. P-49 [Educ. Dep't Meeting Minutes, 12/3/09].) Provost Traverso explained that there were three separate pending actions, in which Reichert was entitled to due process before he could be removed from the education department. (*Id.*) These actions included the charges by students for classroom disruptions and the inappropriate language over text message, and an additional accusation by Professor Wile of plagiarism of a class assignment. (Trial Tr., 1/9/12 at 223; Trial Tr., 1/10/12 at 178.) Provost Traverso also noted that the Education Standards Committee was required to evaluate teacher dispositions before recommending his removal from the department. (Educ. Dep't Meeting Minutes, 12/3/09.)

    Throughout the Fall 2009 semester, the education department received weekly reports from Reichert's field placement elementary school that he was not meeting standards in the classroom. (Trial Tr., 1/10/12 at 178.). Reichert's supervising teacher, Melissa Elliott, regularly communicated her criticisms to him, and Reichert would often respond defensively and blame his students for his mistakes. (Trial Tr., 1/11/12 at 122-24.) Reichert made inappropriate comments to his students during lessons. (*Id.*) For example, he once joked about hanging the students with his tie. (*Id.* at 121.) In early December 2009, a week before Reichert's scheduled final evaluation, Elliott told Reichert's field placement professor, Dr. Don Myers, that Reichert needed more practice in the classroom and was not ready to move on to student teaching. (*Id.* at 123.) On December 3, while Elliott met with Reichert to discuss an earlier lesson, she raised her concerns about his overall work throughout the placement. (*Id.* at 123-24.) During their meeting, Reichert raised his voice, started stuttering and

14

shaking, and then fell to the ground. (*Id.* at 124.) Elliott, who recognized Reichert was having a seizure, stayed with him until he was transported by ambulance to the emergency room. (*Id.*) A week later, Reichert returned to the field placement, and while in the parking lot, he received a phone call from Dr. Tyminski informing him that the placement was terminated, and he was not allowed into the school. (Trial Tr., 1/9/12 at 185.) On December 11, Elliott emailed Reichert expressing the inappropriateness of a telephone call that she received at her home from Reichert's mother questioning why he was unable to finish his placement. (Trial Ex. D-94 [Elliot-Reichert Email, 12/11/09].) Elliott told Reichert that if he wanted additional information about the placement termination, then he should reach out to her through the college. (*Id.*)

Reichert scheduled a meeting for December 9, 2009 with Provost Traverso and Dr. Tyminski to discuss the termination of his field placement. (Trial Ex. P-51 [Tyminski, Graham, Peterson, Calenda Communications, 12/5/09-12/21/09] at 6.) Provost Traverso assured him that the meeting was not a hearing rather was meant to convey information to him about his placement. (*Id.*) Reichert requested to see his assessments in advance of the meeting, but Provost Traverso refused so that they could review them together. (*Id.*) Also on December 9, the Education Standards Committee reviewed Reichert's teacher dispositions forms and recommended to Dr. Tyminski that Reichert be removed from the teacher certification track. (*Id.* at 7.) Dr. Tyminski never acted on the committee's recommendation for Reichert's removal. The December 9 meeting with Reichert never occurred. Instead, in a letter dated December 9, 2009, Reichert's neurologist requested that Elizabethtown College reconsider Reichert's disciplinary status, remove unnecessary stresses that otherwise provoke his physical condition, and permit an immediate medical leave of absence and halting all disciplinary hearings and actions until Reichert's medical condition stabilized. (*Id.* at 11.)

The college granted the medical withdrawal. (Trial Ex. D-141 [Traverso to Reichert Letter, 1/5/10].) All of the pending hearings were put on hold, to be resumed when Reichert returned to Elizabethtown College. (Trial Tr., 1/10/12 at 113, 207.) Reichert never returned to Elizabethtown College, and instead, weeks after Reichert's withdrawal, he enrolled at Montgomery County Community College for the Spring 2010 semester. (*Id.* at 18.) Reichert later enrolled at Westminster College in Utah where he received similar accommodations of extended time and assistive technology as he received at Elizabethtown College. (*Id.* at 7-8; Trial Transcript, 1/9/12 at 85-86.)

## II.   CONCLUSIONS OF LAW

Reichert alleges that Elizabethtown College's conduct toward him violates the ADA and the RA. He also claims Elizabethtown College breached a contract it had with him and that its faculty conspired to discriminate against him based on his disabilities in violation of 42 U.S.C. § 1985.

### A.   Reichert's ADA and RA Claims

Reichert contends that Elizabethtown College failed to provide reasonable accommodations for his disabilities, which constitutes discrimination in violation of Title III of the ADA. Section 12182(a) provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). The term "discrimination" is not directly defined in Title III of the ADA, but the statute includes several general prohibitions, the violation of which constitutes discrimination under section 12182(a). *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 116 (3d Cir. 1998).

16

One such general prohibition is the "denial of participation," which sets out that it is discriminatory to subject an individual, on the basis of his disability, to a denial of the opportunity of that individual to participate in or benefit from the services and privileges of an entity. 42 U.S.C. § 12182(b)(1)(A)(I). Additionally, a public accommodation is also prohibited from providing an individual, on the basis of his disability, an unequal opportunity to participate in or benefit from the services and privileges of that entity. § 12182(b)(1)(A)(ii). Title III also sets out "specific prohibitions" that define discrimination, including:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

§ 12182(b)(2)(A)(ii). To prove a violation of the ADA, a plaintiff must establish: (1) he is an individual with a disability; (2) the defendant is an entity covered by the ADA; and (3) based on his disability, the plaintiff was denied participation in, or benefits of, the defendant's services or accommodations. *See, e.g.*, *Douris v. Dougherty*, 192 F. Supp. 2d 358, 368 (E.D. Pa. 2002).

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To prove a violation of section 504, a plaintiff must prove: (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit in question; (3) he was denied benefits of the program solely by reason of his disability; and (4) the program received federal financial assistance. *Id.* "[I]n looking at whether an individual is otherwise qualified, [a court] must analyze whether the person would be otherwise

17

qualified if reasonable accommodations are made for his/her handicap." *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1009 (3d Cir. 1995). Courts interpret the RA and ADA consistently, and "the substantive standards for determining liability are the same." *McDonald v. Pa. Dep't of Public Welfare, Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995).

It is not disputed that Reichert is disabled under the ADA and RA and that Elizabethtown College is a covered entity. At issue in this case is whether Reichert was denied participation in, or the benefits of, Elizabethtown College's classes and facilities.

### 1.    No Failure to Accommodate

Section 12182(b)(2)(A)(ii) sets out three requirements that must be met before an entity is obligated to provide a requested modification to a disabled individual. The Court must determine "whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of'" the service provided. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001).

"To determine whether a specific accommodation is reasonable, courts apply a 'fact-specific, case-by-case inquiry that considers among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it.'" *Mucci v. Rutgers*, Civ. A. No. 08-4806, 2011 WL 831967, at *21 (D.N.J. Mar. 3, 2011) (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995)). Additionally, "[t]he Third Circuit requires both parties to act in good faith by engaging in an interactive process for purposes of identifying and agreeing on a reasonable accommodation." *Id.* (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311-14 (3d Cir. 1999) (imposing good-faith obligation in employment context)). Furthermore, if accessing a service is difficult but not beyond a plaintiff's capacity, then the

18

accommodation is not necessary. *Logan v. Am. Contract Bridge League*, 173 F. App'x 113, 117 (3d Cir. 2006).

"Educational institutions are in the best position to know what modifications would fundamentally alter their services. Courts generally will not substitute their judgment for that of an educational institution regarding what modifications fundamentally alter these policies." *Doe v. Haverford Sch.*, Civ. A. No. 03-3989, 2003 WL 22097782, at *8 (E.D. Pa. Aug. 6, 2003). Similarly, the RA does not require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 413 (1979). However, while academic judgments of an educational institution are accorded judicial deference, a court must determine that "the educational institution . . . arrived at a rationally justifiable conclusion." *Haverford Sch.*, 2003 WL 22097782, at *7.

Elizabethtown College provided Reichert numerous accommodations including extra time for tests, a distraction-free test site, a note-taker if needed, a substitute for the foreign language requirement, priority course scheduling, and additional time for writing assignments, so long as it did not jeopardize the integrity of the course. (Disability Accommodations Sheet, Fall 2009.) Reichert agreed to these accommodations, and each semester, he signed his accommodation sheets. (*Id.*) These accommodations were more extensive than those recommended by Reichert's high school psychologist. (Psychological Assessments at 5.) The high school psychologist also recommended that Reichert's parents pursue an updated independent evaluation if they believed his needs had changed during college. (*Id.*)

At times, during Reichert's numerous meetings with faculty, Reichert, his mother, and Dixon requested certain additional benefits, such as an exception to the education course work

requirements, feedback provided directly to Dixon, and peer tutoring by a student with a particular background. These requests were not honored. Nevertheless, Reichert's claim fails because he does not present any evidence suggesting that his requested modifications were necessary, reasonable, and would not fundamentally alter the nature of the services Elizabethtown College provides. *See PGA Tour, Inc.*, 532 U.S. at 683 n.38.

Based on the psychoeducational evaluations that Reichert submitted, Elizabethtown College provided all of the recommended accommodations. Elizabethtown College only refused to provide additional time for fieldwork writing assignments, such as lesson plans. Extensions on these assignments are not a reasonable accommodation because, as the faculty explained, Reichert would use the lesson plans to teach classes on scheduled days. Such extensions would prevent student teachers with disabilities from receiving the critical feedback necessary to improve their lesson plans in advance of teaching those lessons and would deprive them of the benefits that students receive from the education department. Such an extension would therefore "fundamentally alter the nature of the services" that Elizabethtown College provides its education students and is not required under the ADA. *See Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 367 (3d Cir. 2008). The Court finds that Elizabethtown College's academic judgment is rationally justifiable. *See Se. Cmty. Coll.*, 442 U.S. at 413.

Reichert also failed to show that his other requested modifications were "necessary" or "reasonable" based on his disabilities. *See Logan*, 173 F. App'x at 117. A number of Reichert's additional requests, such as a peer tutor with a certain background or feedback through Reichert's outside life coach, do not qualify as "reasonable" under the ADA because they fall under "services of a personal nature." The Department of Education's regulations for higher education entities

20

specifically exclude "devices or services of a personal nature," such as as "attendants, individually prescribed devices, [or] readers for personal use or study," from the list of auxiliary aids that must be considered to ensure students with disabilities are not denied the benefits of or participation in postsecondary education. 34 C.F.R. § 104.44(d)(2); *see also* 28 C.F.R. § 36.306.

Given that Elizabethtown College provided Reichert with reasonable accommodations and Reichert's additional requests for accommodations were not shown to be reasonable, necessary, or not to fundamentally alter the nature of Elizabethtown College's services, the Court finds that Reichert fails to demonstrate a failure to accommodate claim under the ADA or the RA.

### 2.      No Denial of Services nor Constructive Denial by Hostile Environment

Reichert has also failed to demonstrate that he was denied the services or advantages of Elizabethtown College. He voluntarily withdrew from the college for medical reasons after having a seizure at his field placement elementary school. On December 9, 2009, his neurologist requested a medical withdrawal "permitting immediate leave of absence and halting all disciplinary hearings and actions until the medical situation is stabilized." (Tyminski, Graham, Peterson, Calenda Communications, 12/5/09-12/21/09 at 11.) Elizabethtown College granted Reichert's medical withdrawal request and informed him that all further requirements for the semester, including course work, conduct and integrity hearings, and professional dispositions review, would be postponed. (*Id.* at 18.) Provost Traverso emphasized that all matters were postponed, not concluded, and that the education department had not taken any final action regarding Reichert's status, course grades, alleged conduct violation, alleged academic integrity violation, or professional assessments. (*Id.*) Reichert never returned to Elizabethtown College. Instead, he enrolled at Montgomery Community College for the following semester, and he later enrolled at Westminster College in Utah. (Trial Tr.,

1/10/12 at 7-8, 18; Trial Tr., 1/9/12 at 85-86.)

However, Reichert contends that he was forced to withdraw due to Elizabethtown College's "campaign of harassment and denial of accommodations, . . . [which] is analogous to a claim of constructive discharge" in the employment context. (Pl.'s Am. Proposed Conclusions of Law ¶ 26.) "A hostile-environment constructive discharge claim entails something more [than a hostile work environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also Smith v. V.I. Port Auth.*, App. A. No. 10-2230, 2012 WL 34670, at *3 (3d Cir. Jan. 9, 2012) (finding that "the alleged harassment did not rise to the required level of 'something more' than offensive behavior" when "the alleged workplace hostility *alone* was not so unbearable as to cause [the plaintiff] to resign").

The Third Circuit uses an objective test to determine whether a plaintiff can recover on a claim of constructive discharge by determining "whether a reasonable jury could find that the [defendant] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (citations omitted). The Third Circuit recognized the following factors as relevant to the issue of constructive discharge in an employment discrimination context: threats of discharge or suggestions to resign, demotions, reduction in pay or benefits, involuntary transfer to a less desirable position, alteration of job responsibilities, and unsatisfactory evaluations. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).

The Court need not determine whether a hostile workplace constructive discharge claim is viable in the educational context or whether the *Clowes* factors are relevant to such a determination

22

because it finds no merit to Reichert's charge of a hostile environment or a constructive discharge. Reichert alleges the following actions by Elizabethtown College created a hostile environment that forced him to withdraw: (1) inducing him to take course loads for which he was not ready; (2) penalizing him for turning in late work; (3) refusing to provide any accommodations during his junior year, including no extensions for written assignments, advance syllabi, or tutoring; (4) accusing him of medical instability; (5) covertly inspecting his emails; (6) assigning Dr. Tyminski as his advisor; (7) telling his classmates that he was unwelcome at the college; (8) failing to discipline another classmate for cursing at him; (9) deliberately destroying emails discussing him; and (10) falsely accusing him of sexual misconduct based on inaccurate reports.

All of these allegations are premised on either incorrect assertions or were permissible actions. The college never induced Reichert to take courses for which he was not ready; to the contrary, it informed him he could take his junior methods block in a later semester. Reichert was not penalized for late work, as he was given numerous extensions. Assigning the department chair as Reichert's advisor, regardless of the perceived tense relationships, does not create a hostile environment. Furthermore, the Court has determined that the college provided Reichert with adequate accommodations. Reichert points out that Elizabethtown College threatened to remove him from the department, instituted hearings against him based on his academic integrity and misconduct, discontinued his field placement thereby jeopardizing his remaining course work, and provided unsatisfactory teacher dispositions. However, the Court attributes each of these actions to the college's concern whether Reichert was otherwise qualified for this program, rather than its hostility toward Reichert because of his disabilities. "An otherwise qualified individual is a person who can meet all of a program's requirements in spite of a disability, with or without reasonable

accommodation." *Millington*, 261 F. App'x at 366. In evaluating whether Reichert was otherwise qualified, the Court must consider the basis for Elizabethtown College's academic decision and "should show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96, n.6 (1978) (Powell, J., concurring).

Viewing the justifications for Elizabethtown College's decisions, and according respect for the faculty's professional judgment, the Court finds that none of Elizabethtown College's actions was the result of Reichert's disabilities. Rather, the actions were based on whether Reichert was otherwise qualified for the program. First, Reichert had been caught cheating on an exam, was accused of plagiarizing material for a group project, was suspected of having a parent or tutor complete an assignment for him, all of which bolsters the college's decision to conduct an academic integrity hearing based on a new allegation of plagiarism by Dr. Wile. Second, the college properly acted upon a complaint about inappropriate text messages, which an administrator had read and summarized, creating a basis for Reichert's pending misconduct hearing. Third, after the chair of the education department learned about a threatening conversation between Reichert and a professor, she found it necessitated an emergency meeting to discuss the situation. During that meeting, numerous professors raised serious concerns about Reichert's comments and conduct during and outside of class, leading to the department's reservations about whether he should stay in the department. Fourth, Reichert's supervising teacher at his field placement repeatedly critiqued Reichert's student teaching before she ultimately recommended discontinuing the placement. Finally,

there was a significant basis for the unsatisfactory teacher disposition evaluations. The Court finds that each of these actions is properly due to Elizabethtown College's concerns over whether Reichert was otherwise qualified for the education program at the college and not due to his disabilities..

The Court concludes that Reichert has failed to demonstrate Elizabethtown College discriminated against him by failing to accommodate him, denying its services, or creating a hostile environment based on his disabilities, and thus Reichert has not established a violation of the ADA or the RA. The Court finds for Defendant Elizabethtown College and against Plaintiff Reichert on Counts I and II.

### B.    Breach of Contract Claim

Reichert claims that Elizabethtown College breached a contract with him by failing to provide appropriate accommodations and by engaging in a pattern of misconduct that forced him to leave the college. Reichert argues that he lost the benefit of his contractual bargain for his entire sophomore year and for the first semester of his junior year, during which Elizabethtown College failed to provide appropriate accommodations. He argues that he suffered additional damages because he had to pay Dixon for "services to enable him to make sense of" Elizabethtown College's program and fees for counseling services due to the "intense humiliation and depression" that he suffered as a result of Elizabethtown College's conduct. (Pl.'s Am. Proposed Findings of Fact ¶¶ 109-10, 112-13.)

To prevail on a claim for breach of contract under Pennsylvania law, a plaintiff must establish: "(1) the existence of a valid and binding contract to which he and the defendants were parties; (2) the contract's essential terms; (3) that he complied with the contract's terms; (4) that the defendants breached a duty imposed by the contract; and (5) damages resulting from the breach."

25

*Gundlach v. Reinstein*, 924 F. Supp. 684, 688 (E.D. Pa. 1996). The relationship between a private college and its students is contractual in nature. *Swartley v. Hoffner*, 734 A.2d 915, 918-19 (Pa. Super. Ct. 1999). "[A] student may bring a contract action to enforce the specific promises made by his university." *Gundlach*, 924 F. Supp. at 688 (citing cases). However, the plaintiff must "identify the specific benefits he was allegedly promised, the means by which he was promised them, and the manner in which Defendants allegedly reneged on those promises." *Id.*

Here, Reichert argues that Elizabethtown College "breached its agreement to provide appropriate accommodations to [him] and instead engaged in a pattern of misconduct that forced [him] to leave the University." (Pl.'s Am. Conclusions of Law ¶ 34.) While Reichert introduced evidence that he and his mother researched colleges, reviewed various websites and college catalogues, and looked into numerous education departments and disabilities departments to determine "which ones were best suited for disabilities," Reichert did not present any evidence of specific promises that were made to him by Elizabethtown College. (Trial Tr., 1/9/12 at 133.) Instead, Reichert testified that he went to an Elizabethtown College open house, listened to Dr. Tyminski speak about the education department, and learned "how they're accepting of students with disabilities and that they . . . treat people equally." (*Id.*) After the meeting, Reichert and his mother spoke privately with Dr. Tyminski and inquired whether the education department worked well with students with disabilities. Dr. Tyminski assured Reichert that the college supported students with disabilities. (*Id.* at 134.) Reichert and Mrs. Reichert also spoke with Deichert, then-Director of Disability Services, who suggested certain testing that must be done to receive accommodations at the college level, and she said that they would "help [him] with self-advocacy, learning [his] skills, working with [him]; . . . they would do whatever was necessary to help [him] succeed, despite

26

having disabilities." (*Id.* at 135.) Based on these conversations with Dr. Tyminski and Deichert, as well as reviewing the college handbook and catalogue, Reichert enrolled at Elizabethtown College. (*Id.* at 134.)

Assuming the existence of a valid and binding contract that included a promise to provide a supportive environment for students with disabilities, accommodations based on individual student needs, and assistance with self-advocacy and work with him to help him succeed, Reichert has failed to prove that Elizabethtown College breached that agreement. Statements in the college handbook and catalogue, website, and discussions at the open house would all become part of any contract between Reichert and Elizabethtown College. *See Gundlach*, 924 F. Supp. at 689. However, despite Reichert's assertions to the contrary, Elizabethtown College provided Reichert with appropriate accommodations and support. Dr. Sagun, Director of Disability Services, testified that she spent five hours a week or more dealing with Reichert and his family, despite another 175 to 200 students at the college with disabilities. (Trial Tr., 1/11/12 at 113.) Dr. Staulters provided lengthy documentation of her contact with Reichert during the 2008-09 academic year, which demonstrated the substantial support that she gave Reichert as his advisor to help him succeed at Elizabethtown College. (*Id.* at 39-40; Staulters' Notes.)

The Court has already found that Elizabethtown College provided Reichert with sufficient accommodations under the ADA and the RA, and it does not find that the college breached any agreement to provide additional accommodations beyond those required under law. For these reasons, the Court finds for Defendant Elizabethtown College and against Plaintiff Reichert on Count III.

C.      **Section 1985**

Reichert brought a claim under 42 U.S.C. § 1985 against Drs. Tyminski, Finley-Bowman, Calenda, Traverso, Pitcher, and Staulters for conduct that denied him his equal protection rights. Reichert argues that the faculty members conspired to remove Reichert from the education department at their emergency meeting in November 2008 and that they were motivated by animus to deprive persons with disabilities from the equal protection of the laws. (Compl. ¶¶ 60, 62.) In furtherance of their conspiracy, Reichert alleges that the faculty voted to not let him continue in the department after Fall 2008 and by completing teacher disposition forms in December 2009 to ensure that he would be removed from the department. (*Id.* ¶¶ 63, 64.) However, Reichert failed to include any arguments on this claim in his pre-trial Proposed Findings of Fact and Conclusions of Law or post-trial Amended Proposed Findings of Fact and Conclusions of Law.

> To state a cause of action under section 1985, a plaintiff must establish:
>
> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983). A plaintiff must also establish "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Farber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). To demonstrate class-based invidiously discriminatory animus, the Third Circuit requires a showing of both form—that the conspiracy was motivated by discriminatory animus against an identifiable class—and function—that the discrimination against the identifiable class was invidious. *Id.* at 136. The class-based group must have "an identifiable

existence independent of the fact that its members are victims of the defendants' tortious conduct." *Id.* at 136.

While the Supreme Court has only considered whether section 1985 applies to racial classification, it left open the possibility that the statute might apply to other forms of class-based animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993); *see also Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997). The Third Circuit has extended the statutory protections to classes based on gender and mental retardation. *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1243 (3d Cir. 1978); *Lake*, 112 F.3d at 686. While the Third Circuit recognized that "the courts of appeals which have considered whether the handicapped as a class are entitled to the protection of section 1985(3) are divided," the *Lake* court expressly declined to define the class of mentally retarded individuals "more broadly to include a wider range of handicaps or the handicapped in general." *Lake*, 112 F.3d at 686 n.5.

This Court need not determine the scope of section 1985 because Reichert has failed to demonstrate that the alleged discrimination was motivated by a "discriminatory animus against an identifiable class" as a whole, rather than against Reichert individually. *See, e.g.*, *Burgos v. Canino*, 641 F. Supp. 2d 443, 458 (E.D. Pa. 2009) (finding plaintiff offered no "evidence of an animus on the part of the defendants against blacks in general, rather than against the plaintiff as an individual"); *Majewski v. Luzerne Cnty.*, Civ. A. No. 05-2396, 2007 WL 1074769, at *8 (M.D. Pa. Apr. 9, 2007) (noting that "plaintiff does not allege a discriminatory animus against an identifiable class, but a discriminatory attitude against him") (internal quotation marks omitted). Accordingly, the Court finds for the individual Defendants and against Plaintiff Reichert on Count V.

**III.    CONCLUSION**

Having concluded that Reichert has failed to demonstrate that Elizabethtown College or any of the individual Defendants discriminated or conspired to discriminate against him based on his disabilities or breached a contract with Reichert, the Court therefore rules in favor of Defendants on all counts. An Order consistent with this Memorandum will be docketed separately.